IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


CHARLOTTE FAYE FARR       )
                                    )
v.                                  )      No. 3:10-1223
                                    )
MICHAEL J. ASTRUE,         )
     Commissioner of Social Security   )


To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the administrative record as a whole, the Court finds that the Commissioner's determination that the plaintiff was not disabled under the meaning of the Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 14) should be granted to the extent that this case should be remanded for further action in accordance with the recommendations contained herein.


## I. INTRODUCTION

The plaintiff filed an application for SSI on February 12, 2008, alleging that she had been disabled since October 31, 1994, due to bipolar disorder, "back-intestinal problems," arthritis, and

a hernia. (Tr. 120-22, 128.) Her application was denied initially and upon reconsideration. (Tr. 52-54, 57-58.) On May 3, 2010, the plaintiff amended her onset date to January 25, 2008, to track the date her application was filed. (Tr. 183.) A hearing before Administrative Law Judge ("ALJ") Barbara Kimmelman was held on May 12, 2010. (Tr. 25-47.) The ALJ delivered an unfavorable decision on June 18, 2010 (tr. 8-20), and the plaintiff sought review by the Appeals Council. (Tr. 4.) On October 22, 2010, the Appeals Council denied the plaintiff's request for review (tr. 1-3), and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on February 14, 1960, and was 47 years old as of January 25, 2008, her alleged onset date. (Tr. 120.) The plaintiff completed high school (tr. 132) and worked as a Salvation Army bell-ringer, fast food cook and cashier, and administrative assistant. (Tr. 134.)

### A. Chronological Background: Procedural Developments and Medical Records

From November of 1994 to March of 2008,[1] the plaintiff was provided treatment from Luton Mental Health Services, which apparently merged into Centerstone Community Mental Health Centers ("Centerstone"), during which time she complained of dizziness, having flashbacks of her middle child's death,[2] stress from the removal of her youngest daughter by the Department of Human Services, panic attacks, moodiness, sleeplessness, disorientation, delusions, asthma, having

_____

[1] The plaintiff recounts in some detail her psychiatric problems between 1994 and 2008. *See* Docket Entry No. 14-1, at 2-7.

[2] The plaintiff related that her middle child died "at age 3 [weeks] . . . shaken by her father" and that her oldest child died in a house fire. (Tr. 537.)

a mini-stroke, and not being able to perform activities of daily living. (Tr. 183-212, 453-977.) She was diagnosed with bipolar disorder with psychotic features, major depressive disorder ("MDD"), obesity, arthritis, hernia and back problems, and hypertension; was prescribed Abilify, Prozac, Trazodone, Doxepin, Wellbutrin, Elavil, Nortriptyline, Amitriptyline, Zyprexa, Depakote, Eskalith, Neurontin, Xananx, Alprazolam, Vytorin, Effexor, Diazepam, BuSpar, and Lortab;[3] and was assigned GAF scores of 30, 40, 45, 52, 55, 58, 59, 60, and 64.[4] *Id.*

---

[3] Abilify is prescribed to treat bipolar disorder and MDD; Prozac, Trazodone, Doxepin, Wellbutrin, Elavil, Nortriptyline, and Amitriptyline are antidepressants; Zyprexa and Depakote are used to treat bipolar disorder; Eskalith is antipsychotic medication; Neurontin is an anticonvulsant; Xanax and Alprazolam are prescribed to treat panic disorders and agoraphobia; Vytorin is prescribed to treat high cholesterol; Effexor is prescribed to treat MDD; Diazepan is a sedative; BuSpar is prescribed to treat anxiety; and Lortab is a pain reliever. Saunders Pharmaceutical Word Book 2, 33, 43, 116, 210, 221, 241, 251, 255, 268, 415, 488, 500, 591, 716, 762, 768, 782 (2009) ("Saunders").

[4] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score within the range of 21-30 means that the plaintiff's "[b]ehavior is considerably influenced by delusions or hallucinations [or] serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) [or] inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends." *Id.* A GAF score within the range of 31-40 means that the plaintiff has "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.* A GAF score within the range of 41-50 means that the plaintiff has "[s]erious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* A GAF score within the range of 61-70 means that the plaintiff has "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) [or] some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

During her treatment at Centerstone, the plaintiff related that she was "good" (tr. 508, 529, 537, 554, 639, 652, 668-69, 717, 799, 879, 883, 913, 973) and doing well (tr. 521, 606, 632), that her medication was working or helping (tr. 453, 472, 494, 496, 520, 614, 619), that she was feeling or getting better (tr. 572, 911), that her mood was "stable" (tr. 544, 680, 717, 830, 917), and that her thoughts were clearer (tr. 620, 911), but that she was not able to "handle" crowds. (Tr. 584) Multiple Tennessee Clinically Related Group ("CRG") assessments indicated that the plaintiff's activities of daily living; interpersonal functioning; concentration, task performance, and pace; and ability to adapt to change were, at worst, moderately limited; that she had a "Severe and Persistent Mental Illness" or was "Formerly Severely Impaired;"[5] and that she was assigned GAF scores of 52, 55, 59, 60, and 64. (Tr. 212-83.)

On April 16, 2008, the plaintiff presented to Dr. Bruce Davis, a consultative examining physician, with complaints of headaches and arthritic pain in her neck, back, and knee. (Tr. 291.) He diagnosed the plaintiff with extreme obesity; musculoskeletal disease in her neck, back, knee, and ankle; gastrointestinal disease, including an "appendectomy, umbilical hernia [and] intestine repairs;" and anxiety and depression. (Tr. 293.) Dr. Davis noted that the plaintiff's "medical conditions are chronic; regular medical/psychological maintenance care with weight loss is warranted," and that she could lift/carry 10-20 pounds occasionally and 10 pounds frequently, that in an eight hour workday she could stand/walk and sit about six hours, that her ability to squat was limited, and that her exposure to heat/humidity and to climbing/heights should be limited. *Id.* A

---

[5] Persons with a "Severe and Persistent Mental Illness" are "recently severely impaired and the duration of their severe impairment totals six months or longer of the past year," and persons who are "Formerly Severely Impaired" are "not recently severely impaired but have been severely impaired in the past and need services to prevent relapse." (Tr. 215, 220.)

CRG assessment also completed by Centerstone on April 16, 2008, indicated that the plaintiff's activities of daily living were markedly limited; that her interpersonal functioning, concentration, task performance, and pace, and ability to adapt to change were moderately limited; that she had a "Severe and Persistent Mental Illness;" and that she was assigned a GAF score of 52. (Tr. 352-54.)

On April 22, 2008, Dr. Deborah Doineau, Ed.D., an examining Disability Determination Services (DDS) psychologist, completed a psychological evaluation (tr. 284-290) and the plaintiff related that she is bipolar, has panic attacks and difficulty concentrating, is able to prepare simple meals, uses public transportation "to get to appointments," shops for groceries, and plays bingo once a month. (Tr. 285, 288.) Dr. Doineau noted that the plaintiff "ambulated with a cane" and had an euthymic mood; diagnosed her with MDD with psychotic features, "rule out bipolar disorder," and "[p]anic disorder without agoraphobia in partial remission;" and concluded that her ability to understand and remember was mildly limited, that her adaptability and social skills were moderately limited, and that her ability to sustain concentration and pace was markedly limited. (Tr. 284, 288-89.)

On May 5, 2008, Dr. Reeta Misra, a nonexamining DDS physician, completed a "DDS Medical Consultant Analysis" and noted that the plaintiff's physical impairments were "not severe, singly or combined." (Tr. 294-97.)

On June 10, 2008, Dr. Marvin Blase, a nonexamining DDS psychiatrist, completed a Psychiatric Review Technique Form ("PRTF") (tr. 298-311) and diagnosed the plaintiff with bipolar syndrome "with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes." (Tr. 301.) He concluded that the plaintiff had mild restriction of activities of daily living and mild difficulty in maintaining social functioning; moderate difficulty

in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 308.) Dr. Blase noted that the plaintiff's treatment records from Centerstone "reflect good stabilization on Ability [sic]," that she "is not considered fully credible based on the considerations that her MHC data does not support the presence of problematic panic disorder," that she has a "good range" of activities of daily living, and that "while the claimant may have evidence of a persisting psych disorder this is not considered so intense or disruptive as to preclude sufficient abilities in the various functional realms." (Tr. 310.)

Dr. Blase also completed a mental Residual Functional Capacity ("RFC") assessment (tr. 312-15) and opined that the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; in her "ability to maintain attention and concentration for extended periods;" in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" in her "ability to interact appropriately with the general public;" in her "ability to accept instructions and respond appropriately to criticism from supervisors;" in her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" and in her "ability to set realistic goals or make plans independently of others." (Tr. 312-13.)

On August 28, 2008, the plaintiff presented to Centerstone and she was diagnosed with bipolar disorder. (Tr. 374.) Additionally, Dr. George T. Davis, a nonexamining DDS psychologist, completed a "Report of Contact" and noted that the plaintiff "alleges no worsening of conditions, no new allegations and no new tx [treatment]." (Tr. 316.) On September 2, 2008, Dr. James P.

Gregory, a nonexamining DDS physician, completed a "Report of Contact" and noted that the plaintiff "alleges no new allegations, and no worsening of current condition." (Tr. 317.)

In October of 2008, the plaintiff presented to the emergency room at Nashville Metro General Hospital with an injured ankle after she slipped and fell on a "slick surface." (Tr. 338.) She was diagnosed with a fractured ankle and prescribed Lortab. (Tr. 338-39.) On October 17, 2008, the plaintiff had successful right ankle surgery (tr. 328) and a November 24, 2008, treatment note indicated that "[x]-rays show good alignment and healing of her comminuted fracture." (Tr. 318.)

From February of 2009 to March of 2010, the plaintiff was provided treatment from Centerstone and she complained of sleeplessness, back problems, and financial problems. (Tr. 345-73, 377-449.) She was diagnosed with bipolar disorder and problems with her hernia; prescribed Trazodone, Abilify, and Benztropine;[6] and assigned a GAF score of 52. *Id.* The plaintiff denied having "depressive or manic symptoms" (tr. 393) and related that she was "'allright'" (tr. 448), "'pretty good'" (tr. 427), "'good'" (tr. 393, 405), "doing fine" (tr. 421), and "'hanging in there'" (tr. 411), and that her "'medicine seems to be working better than antthing [sic] I've ever been on.'" (Tr. 436.) It was noted that she was "stable" on medication (tr. 393, 436, 445, 448), that her medication "helped" (tr. 388), and that her mood was euthymic. (Tr. 388, 393, 405, 411, 421, 427.) Two CRG assessments completed by Centerstone indicated that the plaintiff's activities of daily living were, at worst, markedly limited; that her interpersonal functioning, concentration, task performance, and pace, and ability to adapt to change were moderately limited; that she had a "Severe and Persistent Mental Illness;" and that she was assigned a GAF score of 52. (Tr. 346-51.)

_____

[6] Benztropine, also known as Cogentin, is used to treat muscle spasms normally associated with Parkinson's disease. Saunders at 91, 175.

On March 19, 2010, Dr. Yuejin Chen, a psychiatrist at Centerstone, completed a mental Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement")[7] and concluded that the plaintiff's ability to understand, remember and carry out instructions; to make judgments on simple work-related decisions; to interact appropriately with the public, supervisors, and co-workers was moderately limited, and that her ability to understand, remember and carry out complex instructions; to make judgments on complex work-related decisions; and to respond appropriately to usual work situations and to changes in a routine work setting was markedly limited. (Tr. 450-52.)

### B. Hearing Testimony

At the hearing, the plaintiff was represented by counsel, and the plaintiff and Michelle McBrook-Weiss, a vocational expert ("VE"), testified. (Tr. 27-47.) The plaintiff testified that she completed high school, that she is not able to work because she is not able "to concentrate on small tasks" and has difficulty expressing herself and carrying on conversations, that a friend makes meals for her because she is not able to "concentrate enough to" and helps her with housework, that she walks her dog for ten minutes a day, that she plays bingo at a church community house once a month, that she needs help when she goes grocery shopping, that she does not have a driver's

---

[7] The Commissioner contends that the plaintiff erroneously attributed the Medical Source Statement to Dr. Chen when she should have attributed it to Greg Gannon, a nurse at Centerstone, since only his name appears on the signature line and "[t]here is no indication that Dr. Chen even saw the subject opinion." Docket Entry No. 19, at 20-21. While it is true that Mr. Gannon's signature is the only signature provided on the signature line of the Medical Source Statement, the names of Dr. Chen, Mr. Gannon, and Christy Rogers, LPC, MHSP, appear underneath the signature line. Although the Court agrees with the Commissioner that it may not be absolutely clear, it must be assumed that either Dr. Chen examined the plaintiff or he adopted the findings in the Medical Source Statement.

license, and that she makes and sells dog bandannas as a hobby. (Tr. 29-33.) The plaintiff related that she has spondylosis in her back but that there are no medical records of the impairment because she was "cut off from TennCare" and could not afford to go to the doctor. (Tr. 34.)

The plaintiff testified that she began mental health treatment at Centerstone after the death of her infant daughter because she suffered from postpartum psychosis. (Tr. 35.) She explained that she has stress induced panic attacks two or three times a week, becomes irritated and nervous around other people, and has difficulty concentrating and remembering to take her medication. (Tr. 36-37.) She related that change "throw[s] me into a panic attack, that Abilify causes muscle spasms in her hands, that she has "financial worries," and that she is able to lift five to ten pounds, sit about 30 minutes, and walk about 10 to 15 minutes but that she has difficulty standing. (Tr. 38-40.)

The VE testified that her testimony was consistent with the Dictionary of Occupational Titles. (Tr. 42.) The ALJ asked the VE to consider what work the plaintiff could perform if she could lift 20 pounds occasionally and 10 pounds frequently; could sit for eight hours or stand/walk for four hours, but less than one hour interrupted, in an eight hour workday; could only occasionally climb and work with the public and co-workers; avoided heat, humidity, heights, and climbing ladders, ropes, and scaffolds; and was limited "to simple, one to two-step, routine, repetitive tasks." (Tr. 43.) The VE answered that the plaintiff could perform light work as an assembler and a ticketer, could perform unskilled and light work as a garment sorter, and could perform unskilled and sedentary work as a hand trimmer. (Tr. 43-44.)

Next, the ALJ asked the VE to consider what work the plaintiff could perform if she could only lift 10 pounds; could sit for six hours but for "only 30 minutes at one time;" could stand/walk for four hours but less than one hour interrupted; could only occasionally climb but "never ladders,

ropes and scaffolds;" avoided heat, humidity, and heights; could only occasionally work with the public and co-workers; and was limited "to simple, routine, repetitive tasks," and to a work setting that had minimal changes in routine. (Tr. 44.) The VE testified that it would decrease the number of jobs available as an assembler and garment sorter, but the number of hand trimmer and ticketer jobs would not change. *Id.*

The VE related that the job as an assembler requires frequent handling and fingering, as a garment sorter requires frequent handling and occasional fingering, as a hand trimmer requires constant handling and no fingering, and as a ticketer requires constant fingering and handling. (Tr. 45.) The VE testified that the plaintiff would be precluded from working if her ability to sustain concentration and pace and to respond appropriately to usual work situations and changes in a routine work setting were markedly limited, or if her ability to maintain attention and concentration for extended periods were markedly limited and she were unable to travel alone. (Tr. 45-46.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on June 18, 2010. (Tr. 8-20.) Based on the record, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since January 25, 2008, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: history of multiple hernia and intestinal repair surgeries; right ankle osteopenia with surgery; obesity; bipolar disorder, most recent hypomanic; and panic disorder without agoraphobia in partial remission (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

* * *

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) including the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 4 hours out of 8 hours for less than 1 hour interrupted; sit 8 hours out of 8 hours; occasionally climb ramp/stairs; never climb ladder/rope/scaffolds; avoid heat, humidity, and heights; perform simple, routine, repetitive tasks; and occasionally working with public and co-workers.

* * *

5.     The vocational expert testimony established the claimant has no past relevant work (20 CFR 416.965).

6.     The claimant, born on February 14, 1960, was 47 years old, which is defined as a younger individual, on the date the application was protectively filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7.     The claimant has a high school (12th grade) education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

* * *

10.     The claimant has not been under a "disability" as defined in the Social Security Act since January 25, 2008, the date the application was protectively filed (20 CFR 416.920(g)).

(Tr. 10-19.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to

support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See Edwards v. Comm'r of Soc. Sec.*, 113 Fed.Appx. 83, 85 (6th Cir. Sept. 24, 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting."

20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff

can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997)). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The Five-Step Inquiry**

In this case, the ALJ decided the plaintiff's claim at step five of the five step process. (Tr. 10-19.) At step one, the ALJ found that the plaintiff demonstrated that she had not engaged in substantial gainful activity since January 25, 2008, the application date. (Tr. 10.) At step two, the ALJ determined that the plaintiff's "history of multiple hernia and intestinal repair surgeries; right ankle osteopenia with surgery; obesity; bipolar disorder, most recent hypomanic; and panic disorder with agoraphobia in partial remission" were severe impairments. *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. *Id.* At step four, the ALJ determined that the plaintiff had an RFC to perform light work "including the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 4 hours out of 8 hours for less than 1 hour interrupted; sit 8 hours out of 8 hours; occasionally climb ramp/stairs; never climb ladder/rope/scaffolds; avoid heat, humidity, and heights; perform simple, routine, repetitive tasks; and occasionally working with public and co-workers." (Tr. 11.) The ALJ concluded that the plaintiff had no past relevant work. *Id.* At step five, the ALJ concluded that the plaintiff's RFC allowed her to perform work as an assembler, garment sorter, hand trimmer, and ticket taker. (Tr. 19.)

**C. Plaintiff's Assertions of Error**

The plaintiff contends that the ALJ erred in concluding that she did not meet Listing 12.04 and failed to give proper weight to the opinions of her treating sources and to properly "evaluate her mental conditions in accordance with 20 C.F.R. 416.920a and 416.945(c)." Docket Entry No. 14-1,

at 13-18, 22-23. The plaintiff also argues that the ALJ failed "to consider all the evidence before her" and to properly evaluate her subjective complaints of pain, and erred in determining that she has the RFC to perform light work and in relying on the VE's testimony. *Id.* at 18-22, 23-25.

The plaintiff contends that she meets the requirements of Listing 12.04 for bipolar disorder and that she is entitled to a finding of disability at step three of the five step sequential evaluation process. Docket Entry No. 14-1 at 13-15; 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. The plaintiff has the burden of proof at steps one through four of the sequential disability benefits analysis, including proving presumptive disability by meeting or exceeding a Medical Listing at step three. *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008) (quoting *Her*, 203 F.3d at 391). Thus, the plaintiff has the burden of proof at step three to demonstrate that "[she] has or equals an impairment" listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Little*, 2008 WL 3849937, at *4 (quoting *Arnold v. Comm'r of Soc. Sec.*, 238 F.2d 419, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of the criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). At step three,

> [i]f the claimant is *not performing substantial gainful work* and has a severe impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and [her] impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is disabled without further inquiry.

*Little*, 2008 WL 3849937, at *1 (emphasis added). If the plaintiff demonstrates that her impairment meets or equals a listed impairment, then the ALJ must find the plaintiff disabled. *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

Listing 12.04 mandates a finding of disability when the requirements of both sections 12.04A and 12.04B are met, or when the requirements of section 12.04C are met. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The plaintiff asserts that she meets sections A and B of Listing 12.04 since she was diagnosed with bipolar disorder. Docket Entry No. 14-1 at 14. To meet the requirements of section A(3) for bipolar syndrome, the plaintiff must show that her bipolar disorder was "manifested by the full symptomatic picture of both manic and depressive syndromes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04A3. The plaintiff was diagnosed on multiple occasions with bipolar disorder that was manifested through both manic and depressive symptoms (tr. 183-212, 301, 345-73, 374, 377-449, 453-977), and thus satisfied the requirements of section A(3) of Listing 12.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04A3.

Next, the plaintiff must satisfy the requirements of section B of Listing 12.04 for her bipolar disorder. The Regulations provide that "[t]he criteria in paragraph[] B . . . describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A. In order to be found functionally limited under paragraph B, at least two of the following four restrictions must be present: a marked restriction of activities of daily living;[8] marked difficulties in maintaining social functioning;[9] marked difficulties

---

[8] Pursuant to the regulations:
[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.
20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C1.

[9] The regulations define social functioning as "your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning

in maintaining concentration, persistence, or pace;[10] or repeated episodes of decompensation,[11] each

of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04B.  In relying on Dr. Doineau's

psychological evaluation, Dr. Chen's Medical Source Statement, and Centerstone CRG assessments

(tr. 284-90, 349-54, 450-52 ), the plaintiff contends that she meets the requirements of section

12.04B. Docket Entry No. 14-1 at 14-15.  Dr. Doineau found that the plaintiff's ability to sustain

concentration and pace was markedly limited (tr. 289); Dr. Chen determined that her ability "to

---

includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C2.

[10] The regulations define concentration, persistence, or pace as being "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C3.

[11] The regulations define episodes of decompensation as
exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C4 (emphasis in original).

understand, remember, and carry out complex instructions," "to make judgments on complex work-related decisions, and "to respond appropriately to usual work situations ant [sic] changes in a routine work setting" was markedly limited; and Centerstone CRG assessments indicated that her activities of daily living were markedly limited. (Tr. 349, 352.)

In evaluating the plaintiff's mental impairments, the ALJ assigned "significant weight" to Dr. Doineau's psychological evaluation "insofar as it is consistent with the claimant's residual functional capacity; however, the marked limitation in the ability to sustain concentration and pace is not adopted and accepted as valid, as it was not supported by or consistent with the record as a whole, including the report of the evaluation," and she "[gave] weight" to Dr. Chen's Medical Source Statement "only to the extent that it agrees with the opinions of Dr. Blase and Dr. George Davis and the record as a whole, including her admitted activities" and noted that the marked restrictions Dr. Chen assigned to the plaintiff were "not supported by the weight of the evidence." (Tr. 16-17.)  The ALJ did not address the Centerstone CRG assessments (tr. 11-19), but "accorded weight" to Dr. George Davis's Report of Contact and Dr. Blase's PRTF and mental RFC assessment since their findings "are primarily consistent with the assessment of Dr. Doineau, and supported by the record as a whole." (Tr. 17-18.)

In order to determine whether the ALJ erred in concluding that the plaintiff did not meet Listing 12.04, the Court must first determine whether the ALJ assigned proper weight to the findings of Dr. Chen, Dr. Doineau, Dr. George Davis, and Dr. Blase.  According to the Regulations, there are three different medical sources who may provide evidence: nonexamining sources, nontreating sources, and treating sources.  A nonexamining source is "a physician, psychologist, or other

acceptable medical source[12] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but who does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations characterize "an ongoing treatment relationship" as a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

First, the plaintiff incorrectly classifies Dr. Chen as a treating psychiatrist. Docket Entry No. 14-1, at 16; Tr. 16. Although, as noted *supra*, the plaintiff correctly attributes the Medical Source Statement to Dr. Chen, it is unclear whether Dr. Chen examined the plaintiff in concert with Mr. Gannon, or if he simply adopted Mr. Gannon's findings after the examination. (Tr. 450-52.) This lack of clarity is troubling since the Regulations provide that a medical source's "[e]xamining relationship" is a key component in determining how medical opinions are weighed. 20 C.F.R. § 416.927(d)(1). Assuming arguendo that Dr. Chen did examine the plaintiff before adopting the findings of the Medical Source Statement, he would be classified as a nontreating examining psychiatrist since the record does not reflect that he treated her with any regularity and, since 2008,

---

[12] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

his name only appears once in the record, at the bottom of the Medical Source Statement. (Tr. 452.) *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502). Next, Dr. Doineau would be classified as a nontreating examining consultative DDS psychologist, Dr. George Davis would be classified as a nonexamining DDS psychologist, and Dr. Blase would be classified as nonexamining DDS psychiatrist, since neither examined the plaintiff and both relied on her prior medical records to complete their evaluations. (Tr. 284-93, 298-315.)

Even though Dr. Chen, Dr. Doineau, Dr. George Davis, and Dr. Blase are not classified as acceptable treating sources, and thus the treating physician rule does not apply,[13] the Regulations require the ALJ to evaluate their medical findings in light of

> (1) the examining relationship; (2) the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

---

[13] Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2) (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010) and *Hensley v. Astrue*, 573 F.3d 263 (6th Cir.2009)). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

20 C.F.R. § 416.927(d)(1)-(6).

The ALJ based the assessment of the plaintiff's mental limitations on the findings of Dr. Blase and Dr. George Davis. (Tr. 18.) She concluded that Dr. Doineau's determination that the plaintiff's ability to sustain concentration, persistence, and pace was markedly limited was not supported by her own examination findings since Dr. Doineau noted that "the claimant's memory was intact, and she was able to recall three of three unrelated words immediately and two out of three after five minutes, which suggests she could concentrate enough to remember the words . . . [and] [s]he was also able to spell the words [sic] 'world' forward and backward." (Tr. 16.) She also found that Dr. Chen's determination that the plaintiff was markedly limited in her ability "to understand, remember, and carry-out complex instructions; make judgments on complex work-related decisions; and respond appropriately to usual work situations and to changes in a routine work setting" was not supported by the record evidence because the plaintiff lived alone in "'Section eight'" housing, was using "a grant from Metro Action to pay electric bills;" had a euthymic mood and "good" appetite, energy, and sleep; was in a four year relationship with her boyfriend and "was getting along well with him and his family;" "answered 'no' to all questions on the UNCOPE;[14] (tr. 361)] was selling bandanas she made to dog groomers; and planned to call several other businesses at the suggestion of her case manager." (Tr. 17.)

First, the Court disagrees with the significant amount of weight that the ALJ assigned to the findings of Dr. Blase and Dr. George Davis since neither Dr. Blase nor Dr. George Davis examined

---

[14] According to Evince Clinical Assessments, the UNCOPE is a six question assessment that "provide[s] a simple and quick means of identifying risk for abuse and dependence for alcohol and other drugs." Evince Clinical Assessments, "UNCOPE," at http://www.evinceassessment.com /UNCOPE_for_web.pdf.

the plaintiff.  The Sixth Circuit has held that "[w]ith regard to nontreating, but examining, sources, the agency will simply '[g]enerally [] give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined' [her]." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir.2010) (quoting 20 C.F.R. § 404.1527(d)(1)); *Myatt v. Comm'r of Soc. Sec.*, 251 Fed.Appx. 332, 335 (6th Cir. Oct. 16, 2007).  Next, Dr. George Davis's Report of Contact, completed on August 28, 2008, provides minimal insight into the plaintiff's mental health conditions since it consists of four lines noting that her "conditions" have not "worsen[ed]," she has "no new allegations and no new [treatment]," and "review of prior mental decision is found to be accurate and consistent with the evidence in file." (Tr. 316.)  Further, although Dr. Doineau's psychological examination did indicate that the plaintiff could "recall 3 out of 3 unrelated words immediately," "was able to spell the word 'WORLD' forwards and backwards correctly," and "attempted serial 3's and produced five correct answers," she also noted that "[w]hen asked to perform serial 7's, [the plaintiff] produced one correct response."[15] (Tr. 287.)

Next, Dr. Blase completed his PRTF and mental RFC on June 10, 2008, but he did not have Dr. Chen's Medical Source Statement at his disposal since it was completed on March 19, 2010.  The Commissioner argues that the ALJ properly rejected Dr. Chen's determination that the plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting was markedly limited since "it was inconsistent with the weight of the evidence." Docket Entry No. 19, at n.12.  The Court, however, fails to understand how the plaintiff's "Section eight" housing, use of a grant to pay her electric bills, positive relationship with her boyfriend and his

---

[15] The Regulations provide that "[o]n mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C3.

family, results from a substance abuse screening, hobby of selling dog bandanas, and plan to call businesses provides insight on the plaintiff's ability to respond appropriately to usual work situations and to changes in a work routine or undercuts the marked limitations assigned by Dr. Chen.[16]

Simply put, Dr. Doineau and Dr. Chen, a psychologist and a psychiatrist, respectively, each examined the plaintiff and concluded that she had marked limitations, while Dr. Blase, a psychiatrist, did not examine her and concluded that she had only moderate limitations. A medical source's examining relationship with the plaintiff is one of several factors considered in assigning weight to medical findings, but in this case it tilted the scales in favor of the plaintiff since Dr. Blase did not have the benefit of reviewing Dr. Chen's Medical Source Statement before completing his PRTF and mental RFC. Thus, the ALJ's reasoning for assigning no weight to Dr. Chen's marked limitations was not supported by substantial evidence in the record, and Dr. Doineau's evaluation did show that the plaintiff had difficulty with her ability to concentrate.

While Dr. Doineau and Dr. Chen are acceptable examining medical sources and they both determined that the plaintiff had marked limitations, neither identified specific factors, such as "particular medical signs, laboratory findings," treatment notes, or test results, to support their determinations. (Tr. 289, 450-51.) It is also unclear how the plaintiff's assigned marked limitations correlate to the requirements in section B of Listing 12.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04B. As discussed *supra*, to be found functionally limited under section B of Listing 12.04 at least two of the following four restrictions must be present: a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining

---

[16] The Court agrees with the Commissioner that the ALJ did not err in failing to discuss the Centerstone CRG assessments since none of the assessments were signed and thus, "were completed by anonymous Centerstone sources with unknown qualifications." Docket Entry No. 19, at 17.

concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *Id.*

Dr. Doineau concluded that the plaintiff's ability to sustain concentration and pace was markedly limited, a restriction enumerated in the Listing, but Dr. Chen found that her ability to understand, remember and carry out complex instructions; to make judgments on complex work-related decisions; and to respond appropriately to usual work situations and to changes in a routine work setting was markedly limited, which are restrictions that do not correlate to the Listing. Therefore, this case should be remanded for the ALJ to develop the record by referring the plaintiff to an examining psychiatrist and/or to Dr. Chen to complete a psychological evaluation that aligns with the requirements of section B of Listing 12.04, such as a PRTF;[17] by requesting that the examining psychiatrist and/or Dr. Chen identify specific factors that support their findings; and by requesting that Dr. Doineau provide specific support for her determination that the plaintiff's ability to sustain concentration and pace was markedly limited.

The Court will not address the plaintiff's remaining allegations of error since resolving whether the plaintiff satisfies the requirements of Listing 12.04 may be dispositive of her claim.

## VI. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 14) be GRANTED to the extent that the case should be remanded to the ALJ to develop the record by referring the plaintiff to an examining psychiatrist

---

[17] The difficulty in evaluating this case is clearly compounded by the lack of uniformity in the forms used by the medical professionals.

and/or to Dr. Chen to complete a psychological evaluation that aligns with the requirements of section B of Listing 12.04, such as a PRTF; by requesting that the examining psychiatrist and/or Dr. Chen identify specific factors that support their findings; and by requesting that Dr. Doineau provide specific support for her determination that the plaintiff's ability to sustain concentration and pace was markedly limited.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


_____
JULIET GRIFFIN
United States Magistrate Judge